

**IT IS ORDERED as set forth below:**

**Date: February 11, 2019**

_____
**James R. Sacca**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 13 |
| ARNOLD WADE and | ) | |
| WINNIFRED HERRING WADE, | ) | Case No. 17-21607-JRS |
| | ) | |
| Debtors. | ) | |
| | ) | |
| DALE RECYCLING & USED | ) | Adversary Proceeding |
| AUTO PARTS, INC., | ) | |
| | ) | No. 18-02014-JRS |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ARNOLD WADE and | ) | |
| WINNIFRED HERRING WADE, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

The principal issue before this Court is whether the 87-year-old Mrs. Wade and 74-year-

old Mr. Wade, both of whom live on fixed incomes from social security and pensions, converted

their case from Chapter 7 to 13 in bad faith to gain the benefit of the more generous discharge provisions in Chapter 13. This issue arises through an Objection to Confirmation of Amended Plan and Amended Motion to Dismiss (the "Motion to Dismiss") [Bnkry. Doc. 54] and an Amended Complaint to Object to Discharge of Debtors, to the Dischargeability of Their Debt to Plaintiff, to Determine the Validity and Priority of Claims, and to Subordinate Certain Claims and/or for Damages[1]  (the "Amended Complaint") [Adv. Doc. 10] filed by judgment creditor Dale Recycling & Used Auto Parts, Inc.'s ("DRUAP").

The underlying bankruptcy case was filed by Arnold and Winnifred Wade on August 24, 2017 [Bnkry. Doc. 1]. The Wades are elderly, fixed-income debtors against whom DRUAP obtained a judgment in the amount of $20,000, the circumstances of which will be discussed below. In its Amended Complaint, DRUAP seeks to: (1) deny confirmation of the Wades' plan, (2) deny the Wades' discharge (and find that the debt owed to DRUAP is specifically non-dischargeable), and (3) direct the trustee to pursue fraudulent transfer claims or allow DRUAP standing to do so.[2] The Motion to Dismiss, of which the Amended Complaint is largely duplicative, requests that the Court deny confirmation of the Amended Plan and dismiss the case on the grounds it was allegedly filed (and subsequently converted) in bad faith by the Wades. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(L) and this Court has jurisdiction under 28 U.S.C. § 1334. For the reasons

---

[1] DRUAP's original Motion to Dismiss was amended, at least in part, because the original motion incorporated much of the Chapter 13 trustee's prior objection to confirmation. Since that original Motion, the trustee has considered her objection satisfied, no longer seeks dismissal and recommends confirmation. As such, this Court will not consider arguments made in the trustee's objection and will only consider the arguments made in DRUAP's original motion to the extent they were expressly reasserted in DRUAP's Amended Motion to Dismiss.

[2] Section 548 grants the power to avoid transfers solely to the trustee. While Courts are split as to whether a third-party creditor can possess derivative standing, those courts that do recognize such standing require a formal, written demand upon the trustee, refusal to pursue the transfer by the trustee, and a determination that the refusal is unreasonable by the court. *Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Grp.)*, 66 F.3d 1436, 1438 (6th Cir. 1995). As DRUAP has not followed the proper procedure because no formal demand has been made upon the trustee to bring such an action, the Court will deny this part of the relief without prejudice and will not reach the merits of DRUAP's argument as it relates to fraudulent transfers.

below, this Court will dismiss DRUAP's Amended Complaint, deny the Motion to Dismiss and confirm the Wade's Amended Plan.

## FACTS

The Wades are retired and subsist on income from social security and pension plan payments. Mrs. Wade is 87-years-old, and Mr. Wade is 74-years-old. DRUAP's claim arises from a longstanding and contentious dispute between DRUAP and certain nearby residents, including the Wades, over the existence and operation of DRUAP's recycling and automobile salvage business. The Wades, the Clarks, the Gerrins, and Nancy Ledford (collectively the "Neighbors") engaged in litigation with DRUAP over the course of five years, culminating in a judgment in favor of DRUAP in the Superior Court of Jackson County against the Neighbors in 2017. DRUAP's pleadings allege that the Neighbors engaged in a smear campaign, spearheaded by the Clarks, to shut down DRUAP by attempting to generate broad opposition to its continued operation. DRUAP alleges that the Clarks disseminated false information about the legality and safety of DRUAP's operations, both verbally and in the form of lawn signs and flyers. The Wades displayed some of the signs on their property.

DRUAP contends that the Neighbors tried to extort money from it, and when that proved unsuccessful, the Neighbors hired an attorney who issued a cease and desist letter to DRUAP. Shortly thereafter, the Neighbors, while represented by an attorney, sued DRUAP for nuisance and trespass in the Superior Court of Jackson County in a case styled *Jackie Clark, et al. v. Dale Recycling & Used Auto Parts, Inc.*, No. W14CV0705 (the "Lawsuit"). The action sought damages and a permanent injunction of DRUAP's business activities.[3] In response, DRUAP counterclaimed for defamation, tortious interference with business relations, and conspiracy.[4] The Lawsuit was

---

[3] As the case progressed the Neighbors withdrew their claim for injunctive relief.

then tried before a jury, which rendered a general verdict. In its verdict, the jury found that DRUAP was not liable for nuisance or trespass and generally found in favor of DRUAP on DRUAP's counterclaims. The judgment awarded DRUAP $20,000 against the Wades,[5] and other judgments were awarded against the Neighbors, the largest of which was $70,000 against the Clarks. The Wades then filed a voluntary Chapter 7 petition on August 24, 2017, one day prior to DRUAP conducting its post-judgment discovery.   The Chapter 7 trustee filed a Report of No Distribution on September 25, 2017.   About a week before the deadline by which DRUAP had to file a complaint to determine the dischargeability of its claim and object to the discharge of the Wades, the Wades moved to convert their case to Chapter 13 and an order was entered converting the case to Chapter 13 on December 1, 2017 [Doc. 28].  DRUAP thereafter filed a timely proof of claim in the Wades' bankruptcy.

At the time of filing, the Wades' primary assets consisted of their residence which they valued at less than $90,000, another home they valued at $69,000, a 2011 Chevy Tahoe worth $23,000, a 20-year-old Ford F-150 pick-up truck worth $2,500, a burial plot worth $2,500, typical household goods worth a few thousand dollars, and a few thousand dollars in a credit union account. The Wades claim to have no equity in any of these assets. With respect to their secured liabilities on the petition date the Wades had a reverse mortgage on their residence for $160,000, a mortgage on the other home for $81,000, a lien on the Chevrolet Tahoe for $26,000 in favor of a credit union, and a right of set-off in favor of the credit union with respect to the cash held in the Wades' credit union account. The Wades' other liabilities consisted of the DRUAP judgment,

---

[4] DRUAP also initially asserted a claim for attorney's fees under the Georgia abusive litigation statute for $65,000, but that claim had not yet been filed in state court at the time the Wades filed for bankruptcy. During the hearing on December 17, 2018 counsel for DRUAP indicated that it would not be pursuing this litigation against the Wades.
[5] Because the Wades income comes from social security and private pensions, collection is difficult because neither can be garnished, but while the social security income can also generally not be attached in a bank account, it could be possible to attach the private pension income if it was deposited in a bank account.

which is secured by a judgment lien on the real estate but which the Wades have sought to avoid under § 522 to make it an unsecured claim, a claim for abusive litigation, a judgment against Mr. Wade in favor of Midland Credit for about $19,000, a credit card debt to Capital One for $6,000, and a medical debt owing to North Georgia Medical Center for about $1,300.

The Wades' initial Chapter 13 plan proposed a plan payment of $710 per month and a zero percent dividend to unsecured creditors. Based on their income, any plan proposed by the Wades' is subject to an applicable commitment period of 36 months. The Chapter 13 trustee and DRUAP objected to this initial proposed plan.  The Wades have since filed an amended Schedule J that showed an increase generally in their expenses and consequently decreased the disposable income available to contribute to a plan along with an amended Chapter 13 plan that reflected that decrease which reduced the proposed plan payment to $550 per month and retained that zero percent dividend to unsecured creditors. The Wades proposed to surrender their second home and the balance in their credit union account under both plans. Under the initial and amended plan, after the trustee takes her commission and the Wades' attorney's fees are paid, only the credit union will be paid on its secured claim on the Chevrolet Tahoe. The Chapter 13 trustee is satisfied with the Amended Plan, has withdrawn any objections, and recommends confirmation of the Amended Plan. DRUAP has continued to object to the Wades' amended plan.

DRUAP's objections to the Amended Plan can generally be summarized as follows. First, DRUAP argues that the Wades have inappropriately scheduled expenses for the care of their non-custodial great grandchild and improperly borrowed funds to pay the bail of Winnifred Wade's son.[6] Second, DRUAP alleges that the Wades' conversion to Chapter 13 constitutes a bad faith attempt to discharge a debt that would not be dischargeable in Chapter 7 and the Wades' plan does

---

[6] The payment on the bail was only a few hundred dollars.

not propose to pay DRUAP anything on the judgment. Third, DRUAP asserts that the Wades should be required to pay into their plan for 60 months in order to pay something to unsecured creditors even though they qualify for a 36 month applicable commitment period. Finally, DRUAP asserts various other objections to alleged post-petition payments and debtor's amended schedules that this Court will address in assessing DRUAP's allegations of bad faith.

## DISCUSSION

### A.  Dischargeability in Chapter 7 as Opposed to Chapter 13

Section 523(a)(6) of the Bankruptcy Code dictates that a Chapter 7 debtor may not discharge any debt arising from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The consequence of this is that a Chapter 7 debtor may not discharge any debt which arises from the debtor's intentional injury of another person or entity. *In re Jennings*, 670 F.3d 1329, 1334 (11th Cir. 2012)("[A] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury.")(*quoting In re Walker*, 48 F.3d 1161, 1165 (11th Cir. 1995)).

However, § 523(a)(6) does not apply to Chapter 13 debtors. *In re Adams*, 478 B.R. 476, 486 (Bankr. N.D. Ga. 2012)(Diehl, J.). Instead, § 1328(a)(4) more narrowly prevents a debtor from discharging any restitution or damages, "awarded in a civil action against the debtor as a result of willful or malicious injury by the debtor that caused *personal injury to an individual* or the death *of an individual*." 11 U.S.C. § 1328(a)(4)(emphasis added). Rather than broadly preventing the discharge of any willful or malicious injury to any "entity," § 1328(a)(4) only bars the discharge

6

of willful or malicious "personal injury to an individual." *Compare* 11 U.S.C. § 523(a)(6), *with* 11 U.S.C. § 1328(a)(4).

When Congress uses particular language within one section of a statute, but uses different language in another section, this difference is presumed to be intentional. *See Russello v. United States*, 464 U.S. 16, 23 (1983). In drafting § 1328(a)(4), Congress substituted the word "entity" for "individual." 11 U.S.C. § 1328(a)(4). Although "individual" is not defined in the Bankruptcy Code, the plain meaning of the term is instructive. *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1550-51 (11th Cir. 1996). Utilizing the plain meaning of "individual," Congress' substitution of the word "entity" for "individual" can best be read as limiting nondischargeability to restitution or damages resulting from injuries suffered by natural persons. *See In re JAC Family Found.*, 356 B.R. 554, 556 (Bankr. N.D. Ga. 2006)(Bihary, J.)(*quoting Webster's Third New International Dictionary Unabridged*, 1152 (Philip Babcock Gove ed., 1976))(defining an "individual" as "a single human being as contrasted with a social group or institution"); *see also Jove Eng'g, Inc.*, 92 F.3d at 1550 ("We conclude the plain meaning of the term 'individual' does not include a corporation, and applying this meaning is not demonstrably at odds with Congress's intent").

Congress also narrowed the scope of nondischargeability in Chapter 13 by limiting those willful or malicious injuries to "personal injuries." 11 U.S.C. § 1328(a)(4). Although it appears in Title 11 several times, the term "personal injury" is also not defined anywhere in the Bankruptcy Code. *In re Adams*, 478 B.R. at 485. Despite this, Congress's inclusion of the term in § 1328(a)(4) should be presumed to be meaningful. *Id.* (*quoting Tovar v. U.S. Atty. Gen.*, 646 F.3d 1300, 1306 (11th Cir. 2011)). The most presently relevant definition of "personal injury" is a nonfinancial and nonbusiness interest injury to an individual. *In re Adams*, 478 B.R. at 486. This injury need not be physical nor require any bodily harm. *Id.* at 487 ("Congress can be presumed to have understood

7

the difference between 'personal injury' and 'personal physical (or bodily) injury' when drafting 11 U.S.C. § 1328(a)(4) for the 2005 amendments to the Bankruptcy Code."). Rather, a "personal injury" may be a nonphysical injury, such as those arising from defamation or intentional infliction of emotional distress. *Id.*

Here, the Court believes that while DRUAP's judgment against the Wades could possibly be nondischargeable in Chapter 7[7], it is certainly dischargeable in Chapter 13. DRUAP's judgment arises from a general jury verdict that included, among other things, a defamation claim against the Wades, but it also included a claim for tortious interference with business relations which is not per se non-dischargeable in a Chapter 7. *In re Cantu*, 389 F. App'x 342, 346 (5th Cir. 2010). In Chapter 7, this judgment would be nondischargeable if it was based on the defamation claim because that would satisfy § 523(a)(6)'s broad criteria of being a "willful" injury to an "entity." However, upon conversion to Chapter 13, DRUAP's judgment, even if it was based on defamation, would fall outside the narrower nondischargeability provisions of Chapter 13. Although defamation is sufficiently "personal" to qualify as a "personal injury" under existing law, this injury was suffered by Dale Recycling & Used Auto Parts, Inc., a corporate entity. Because DRUAP is not a natural person, it cannot satisfy the "to an individual" criteria of § 1328(a)(4). The inevitable application of the plain meaning of the text of § 1328(a)(4) precludes a finding of nondischargeability. Thus, the only remaining question in determining the ultimate dischargeability of DRUAP's judgment is whether the Wades' conversion from Chapter 7 to Chapter 13 was proper or whether it was done in bad faith.

---

[7] It is worth noting that Debtor's counsel does not concede that the debt would be nondischargeable in a Chapter 7.

**B.  Conversion from Chapter 7 to Chapter 13**

A Chapter 7 debtor may generally convert his or her case to Chapter 13, and vice versa, at "any time." *See* 11 U.S.C. § 706(a); 11 U.S.C. § 1307(a), (c).  However, this right to convert is not absolute and is limited by the bankruptcy judge's broad § 105(a) discretion.  *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 375 (2007).  This Court, therefore, is empowered to bar conversion if such conversion would constitute an "abuse of process." *Id.*

Such an "abuse of process" is best understood to be any attempt by a debtor to convert his or her case to a chapter that the debtor could not have initially filed under.  In *Marrama,* the United States Supreme Court reduced prepetition bad faith conduct to a question of whether the debtor could have originally filed under Chapter 13.

> Bankruptcy courts nevertheless routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words "for cause." In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct, including fraudulent acts committed in an earlier Chapter 7 proceeding, *is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13*. That individual, in other words, is not a member of the class of "honest but unfortunate debtor[s]" that the bankruptcy laws were enacted to protect. *Marrama*, 549 U.S. at 373-74 (emphasis added).

Relying on § 706(d), *Marrama* guided bankruptcy courts to employ their discretion over § 105(a) to prevent conversion only if a debtor would not otherwise qualify as a debtor under Chapter 13. *Marrama* did not imbue bankruptcy judges with an unbridled discretion to prevent conversions; rather, it permitted bankruptcy courts to holistically determine if the debtor could be a debtor in his or her desired chapter.  *Law v. Siegel*, 571 U.S. 415 (2014)("Therefore, the Court [in *Marrama*] suggested, even if the Bankruptcy Court's refusal to convert the case had not been expressly authorized by § 706(d), that action could have been justified as a way of providing a 'prompt, rather than a delayed, ruling on [the debtor's] unmeritorious attempt to qualify' under § 1307(c).").

9

In view of *Marrama*, the analysis of good faith must invariably turn on whether the Wades could have qualified for Chapter 13 at the time of their initial filing and, if so, whether subsequent post-petition conduct during the pendency of their Chapter 7 would have disqualified the Wades from filing under Chapter 13.

### C. Whether the Wades Could Have Initially Filed under Chapter 13

A debtor's eligibility to file under Chapter 13 is reliant on that debtor's ability to satisfy the requirements of § 109(e).  11 U.S.C. § 109(e); *see also In re Lewis*, 339 B.R. 814, 816 (Bankr. S.D. Ga. 2006).  Section 109(e) requires Chapter 13 debtors to have income that is "sufficiently stable and regular to enable such individual to make payments under a plan." *In re Robinson*, 535 B.R. 437, 443 (Bankr. N.D. Ga. 2015)(Sacca, J.)(*quoting* 11 U.S.C. § 101(30)).  Additionally, § 109(e) requires the debtor have debt within § 109(e)'s set debt limits.  *In re Pete*, 541 B.R. 917, 920 (Bankr. N.D. Ga. 2015)(Sacca, J.). The Wades have met these requirements.

Once a debtor has satisfied § 109(e)'s regular income and debt requirements, the debtor may still have his or her case dismissed "for cause." 11 U.S.C. § 1307.  Section 1307(c) sets out a non-exclusive list of factors that would constitute "cause" for conversion or dismissal.  One of the expressly enumerated factors is "denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan." 11 U.S.C. § 1307(c)(5).  Consequently, a debtor who has no prospect of producing a confirmable plan is subject to having his or her case dismissed "for cause." *See Dean v. Suntrust Bank*, No. CIV.A.1:07CV00248JEC, 2007 WL 1953151, at *4 (N.D. Ga. June 29, 2007).

Section 1325, in turn, lays out the criteria for a Chapter 13 plan to be confirmed.  11 U.S.C. § 1325.  Notably, § 1325 requires that a confirmable plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1325(a)(3).  The Bankruptcy Code does not define

10

"good faith." *In re Huether*, No. 17-41142-MGD, 2018 WL 542680, at *2 (Bankr. N.D. Ga. Jan. 24, 2018)(Diehl, J.).  However, the Eleventh Circuit has enumerated eleven factors which this Court may consider in conducting its inquiry into the debtor's good faith.  *In re Kitchens*, 702 F.2d 885, 888 (11th Cir. 1983).[8]  These factors are as follows:

> (1) the amount of the debtor's income from all sources;
> (2) the living expenses of the debtor and his dependents;
> (3) the amount of attorney's fees;
> (4) the probable or expected duration of the debtor's Chapter 13 plan;
> (5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;
> (6) the debtor's degree of effort;
> (7) the debtor's ability to earn and the likelihood of fluctuation in his earnings;
> (8) special circumstances such as inordinate medical expense;
> (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors;
> (10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors;
> (11) the burden which the plan's administration would place on the trustee.
> *In re Kitchens*, 702 F.2d 885, 888–89 (11th Cir. 1983).[9]

While these enumerated *Kitchens* factors can serve to guide this Court in its inquiry into the Wades' good faith or lack thereof, *Kitchens* clearly encourages courts to engage in a totality of the circumstances analysis to determine a debtor's good faith. *In re Brown*, 742 F.3d 1309, 1317 (11th Cir. 2014)("While *Kitchens* does not use this phrase, it basically adopts a 'totality of the circumstances' approach for determining good faith or lack thereof").

### 1.  The amount of the Debtors' income from all sources

Despite its prominent position as the first enumerated factor in *Kitchens*, there is some disagreement concerning whether courts should continue to consider the amount of a debtor's

---

[8] DRUAP's arguments relate to *Kitchens* factors 2,4,5,6, and 10, but the Court analyzed the totality of the circumstances which included all of the factors in making its determination.

[9] "BAPCPA subsumes the future application of certain of the Kitchens factors. BAPCPA amendments to the disposable income sections of  § 1325(b), new rules on serial filers, and other code requirements may limit such inquiries. Otherwise, barring specific conflict with the new statute, there is no indication the factors are not still good law in the Eleventh Circuit." *In re Roberts*, 366 B.R. 200, 203 (Bankr. N.D. Ala. 2007).

income in its good faith analysis. *Compare In re Shelton*, 370 B.R. 861, 867 (Bankr. N.D. Ga. 2007)(Murphy, J.)("Good faith has no role in assessing whether the amount of income paid into the plan is sufficient, one of the Kitchens prongs"); *with In re Paley*, 390 B.R. 53, 59 (Bankr. N.D.N.Y. 2008)("Satisfaction of § 1325(b) does not displace the good faith analysis required under § 1325(a)(3)."). This question becomes further complicated when the debtor's income is derived from Social Security payments. *Matter of Ogden*, 570 B.R. 432, 436 (Bankr. N.D. Ga. 2017)(Drake, J.)("The sections of the Code discussed above show a clear intent to protect Social Security income from the bankruptcy process."), *amended*, No. 16-12280-WHD, 2017 WL 2124413 (Bankr. N.D. Ga. May 15, 2017). Numerous courts have held that Social Security income does not need to be contributed to a Chapter 13 plan. *Id.*

Regardless of the vitality or lack thereof of the first *Kitchens* factor, there are no facts to suggest that the Wades are contributing insufficient income into their plan. In fact, the Wades have proposed to commit all of their social security income and pension income into the plan, despite arguably not being required to do so.[10] Cases which have found there to be an issue with the debtor's contributed income have so found where the debtor withheld monthly income for the purpose of retaining surplus disposable income. *See e.g. In re Thomas*, 443 B.R. 213, 219 (Bankr. N.D. Ga. 2010)(Murphy, J.). No such evidence of withholding exists in this case. Consequently, the amount of the Wade's income does not demonstrate a lack of good faith.

**2.  The living expenses of the Debtors and their dependents**

A plan may be proposed in bad faith where the debtor insists on living lavishly while refusing to make his or her creditors whole. *In re Bandini*, 165 B.R. 317, 320 (Bankr. S.D. Fla. 1994). Where a plan does not pay creditors 100% of their allowed claims, heightened scrutiny

---

[10] The Wade's amended Schedule J indicates that their net monthly income is $550.00. [Doc. 53]. The Wades state in their plan that they will contribute $550.00 per month into their plan. [Doc. 50].

may be focused on any outlandish expenditures of the debtor. *Id.* (dismissing case for the "lavishness of the debtor's lifestyle," which included purchasing multiple Corvettes and expensive pieces of jewelry). DRUAP asserts that Debtors have acted in bad faith by proposing a plan which would "pay nothing to unsecured creditors and merely fund their payments on an expensive vehicle that is disproportionately costly in relation to their purported financial condition." [Bnkry. Doc. 49 at ¶ 50]. Despite this assertion, this Court does not find that payments towards a 2011 Chevrolet Tahoe, a six-year-old car at the time the case was filed, nor any other items the Debtors listed in their schedules, to be sufficiently "lavish" to indicate bad faith. Additionally, the Wades have voluntarily agreed to surrender the additional house they owned which is an indication they have scaled down their expenses.

### 3. The amount of attorney's fees

The amount of an attorney's fees may call into question the good faith of the debtor where such fees are clearly unreasonable and significantly harm the return to creditors. *In re Zepecki*, 258 B.R. 719, 725 (B.A.P. 8th Cir. 2001), *aff'd*, 277 F.3d 1041 (8th Cir. 2002) ("The Attorney did not prove that fees constituting a sham were reasonable."). Here, there is no allegation that the Wades' attorney's fees are excessive. In fact, the Wades' attorney's fees are below the average for the district.

### 4. The probable or expected duration of the Debtors' Chapter 13 plan

The probable or expected duration of a debtor's plan may indicate bad faith where the term of the plan is less than sixty months and significant income is being withheld from the plan. *In re Dalby*, 38 B.R. 107, 112 (Bankr. D. Utah 1984). Therefore, an evaluation of the expected term of the debtor's plan must be made in the context of the debtor's use of his or her disposable income. *See In re Whitlock*, 308 B.R. 917, 923 (Bankr. M.D. Ga. 2004). Issues arise with the term of the

13

debtor's plan where the debtor has withheld income at the expense of his or her creditors. *See generally In re Dalby*, 38 B.R. at 112.  In this case, although the elderly Wades are subject to a 36 month applicable commitment period, their plan will actually extend beyond 36 months to make all of the required payments and they are committing all of their income, including their social security income, to fund the plan. Consequently, there is no issue that might be cured by extending the plan's term for any months beyond what is required to pay the administrative costs and the secured creditor.

5.  **The motivations of the Debtors and their sincerity in seeking relief under the provisions of Chapter 13**

Bad faith may be found where the Chapter 13 debtor is not sincerely motivated to pay his or her creditors over the life of the plan.  *See generally In re Brown*, 742 F.3d 1309 (11th Cir. 2014). Circumstances suggesting such insincerity may be those where the debtor's best interests are clearly better served in a different chapter.  *Id.* (finding a debtor's Chapter 13 filing to be insincere where the debtor was the paradigmatic candidate for Chapter 7, but filed under Chapter 13 exclusively to pay his attorney's fees in installments).  The Wades have demonstrated no such insincerity in their motion to convert from Chapter 7 to Chapter 13. They have two judgments against them totaling almost $40,000 which they cannot pay.  Conversion is not clearly against the Wades' best interest and the plan proposes to pay out all disposable income for the life of the plan. This Court finds there to be no insincerity to support a finding of bad faith.

6.  **The Debtors' degree of effort**

A debtor's lack of effort may justify a finding of bad faith where proposed plan payments are nominal in view of the debtor's ability to pay and in light of the debtor's discretionary expenses. *See e.g. In re Lott*, No. 10-06061-TOM-13, 2011 WL 1981740, at *7 (Bankr. N.D. Ala. May 23, 2011).  Here, the Wades do not propose to maintain any significant discretionary expenses and, as

14

previously stated, the plan proposes to surrender property and pay all disposable social security and pension income into the plan.

### 7.  The Debtors' ability to earn and the likelihood of fluctuation in their earnings

Chapter 13 requires the debtor to have a consistent income which can support plan payments for the life of the plan.  *In re Buccolo*, 397 B.R. 527, 530 (Bankr. D.N.J. 2008), *aff'd*, No. CIV.A.09-314 FLW, 2009 WL 2132435 (D.N.J. July 13, 2009).  As such, if the debtor has frequent and meaningful fluctuations in his or her ability to earn, proposing a plan which ignores these likely fluctuations may demonstrate bad faith.  *Id.* at 535–36 (finding a plan was proposed in bad faith where the debtor's income was extremely variable and plan payments relied on her ability to borrow money).  The Wades do not have income that is variable or otherwise likely to fluctuate. Quite the opposite, the Wades are a fixed income household; entirely reliant on social security and pension income.  Consequently, there is no bad faith derived from the Wades' ability to earn.

### 8.  Special circumstances such as inordinate medical expense

Special circumstances, such as significant medical expenses, may reduce the feasibility of a debtor's plan to such an extent that a debtor proposing a plan that ignores those circumstances may have acted in bad faith.  *See generally In re Goodavage*, 41 B.R. 742 (Bankr. E.D. Va. 1984). Those special circumstances may exist where there is a history of medical expenses which would likely persist past confirmation of the plan.  *Id.* at 746 (noting the debtors' history of large medical expenses and the debtors' budget, which allotted an unrealistically small amount for future medical expenses).  Although the Wades may have increased medical expenses as they age, this would not render the plan infeasible, but rather probably result in the suspension of plan payments or modifications of the plan that would extend the term of the plan.  There has been no evidence

entered, nor has the existence of any evidence been suggested, that the Wades will likely confront special circumstances which would render their plan infeasible. As a result, the eighth *Kitchens* factor also does not demonstrate bad faith.

**9. The frequency with which the Debtors have sought relief under the Bankruptcy Reform Act and its predecessors**

Similar to the first *Kitchens* factor, there is some dispute as to whether bankruptcy courts should consider a debtor's successive prior filings in their good faith analyses.[11] *Compare In re Keach*, 243 B.R. 851 (B.A.P. 1st Cir. 2000); *with In re Hilton*, 122 B.R. 138 (Bankr. M.D. Fla. 1990). Those courts that continue to include successive filings in their good faith inquiries often do so by investigating whether the debtor's serial filings produced any material change in the debtor's circumstances. *See In re Pike*, 258 B.R. 876, 885 (Bankr. S.D. Ohio 2001)(dismissing a Chapter 13 filing for bad faith where debtor had four prior filings and no material change in circumstances). Here, however, the Court was unable to find any filings by the Wades in the last twenty years. As such, the ninth *Kitchens* factor does not reveal bad faith.

**10. The circumstances under which the Debtors have contracted debts and demonstrated bona fides, or lack of same, in dealings with creditors**

If a debtor has contracted his or her debts via conduct which would call into question the debtor's motives and intent, a bankruptcy court may deem the debtor's petition to have been filed in bad faith. *In re Crawford*, No. 08-30192-DHW, 2008 WL 2783461, at *3 (Bankr. M.D. Ala. July 16, 2008)(dismissing a Chapter 13 case where the debtor misrepresented the location of collateral after almost immediately defaulting on the purchase contract for that collateral). The Wades have not made any recent purchases upon which they immediately defaulted, nor is there

---

[11] The amendments to the Bankruptcy Code in 2005 added specific provisions regarding serial filers.

any evidence that they sought out financing to purchase items they knew they could not afford. As such, there is no demonstrated conduct which would support a finding of bad faith.

**11. The burden which the plan's administration would place on the trustee.**

A finding of bad faith may occur where the debtor has proposed a plan which would place an undue administrative burden on the trustee. *In re Brown*, 742 F.3d 1309, 1318 (11th Cir. 2014). To illustrate, an undue burden has been found in instances where the debtor's plan called for the trustee to almost exclusively pay attorney's fees for the life of the plan. *Id.* Conversely, here, there is no indication, nor any complaint, of an undue burden being placed on the trustee.

**12. Other considerations**

In addition to the expressly enumerated eleven factors, *Kitchens* discussed other factors that a bankruptcy court could use in its good faith analysis referencing case law from the Eighth Circuit. *See generally In re Kitchens*, 702 F.2d at 889 (*citing In re Estus*, 695 F.2d 311 (8th Cir. 1982)). Most pertinent to this Court's present inquiry is "the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7." *In re Estus*, 695 F.2d at 317. DRUAP argues that because the debt would not be dischargeable in Chapter 7, the Wades' conversion to Chapter 13 demonstrates bad faith. This Court disagrees.

"'[I]t is not "bad faith for [the Debtor] to adhere to the provisions of the Bankruptcy Code and, in doing so, obtain a benefit provided by it.'" *Matter of Ogden*, 570 B.R. at 438 (*quoting In re Cranmer*, 697 F.3d 1314, 1319 (10th Cir. 2012)). Where the Bankruptcy Code allows a debtor to discharge a debt in Chapter 13 that the debtor would not have otherwise been able to discharge in Chapter 7, it is not for this Court to substitute its judgment for Congress'. *In re Green*, No. 17-11119, 2018 WL 1581635, at *4 (Bankr. S.D. Ga. Mar. 27, 2018). In writing § 523, Congress

expressly excluded Chapter 13 debtors.  Instead, Congress made the policy decision to enact
§ 1328, which gave debtors a broader ability to discharge debts.  11 U.S.C. § 1328(a)(4).

Here, the Wades converted their Chapter 7 bankruptcy to Chapter 13 to take advantage of
Chapter 13's broader discharge.  This Court does not fault the Wades for initially filing a Chapter
7 case to see if DRUAP would contest the dischargeability of the debt and then converting the case
when it became likely DRUAP would.  The implication of this broader discharge in Chapter 13
will be that the Wades can discharge their judgment debt owed to DRUAP after paying future
income into their plan for the life of the plan.  Regardless of whether this is the ideal outcome of
conversion for DRUAP, it is statutorily permissible.  The Supreme Court has held that § 105(a)
does not empower courts to contravene the express provisions of the Bankruptcy Code.  *Law v.
Siegel*, 571 U.S. 415 (2014)("[I]t is not for courts to alter the balance struck by the statute").  This
Court will not contravene the Bankruptcy Code by giving DRUAP an implicit power to veto the
conversion of this case.

**D.  Comparisons with *In re McGovern***

DRUAP principally relies on *In re McGovern*, 297 B.R. 650 (S.D. Fla. 2003) to support
their argument that the Wades do not meet the good faith requirement of § 1325(a)(3).  In
*McGovern*, the debtor ("McGovern") was a recent law school graduate with a first-year associate's
salary of $75,000, bonuses of $15,000, and the potential to earn significant raises each year. *Id.* at
654. McGovern had been a co-defendant in litigation revolving around an accusation he made
against a fellow undergraduate ("Grapski") who was running for student president at the university
they both attended in which he claimed that Grapski was a convicted child molester. *Id.* at 653.
McGovern was sued for defamation and Grapski was awarded an approximately $80,000 judgment
against McGovern. *Id.* McGovern filed under Chapter 13 after having threatened to do so in order

to avoid the Grapski claim for several years. *Id.* at 661. McGovern failed to disclose bonus income

in his filing and had leased a luxury vehicle less than 60 days before filing *Id.* at 659. The bulk of

his debts were student loans, lawyer's fees related to the Grapski case, and the judgment. *Id.* The

court found that McGovern filed for the sole purpose of discharging a judgment which accounted

for 96% of his total potentially dischargeable debt. Based on the circumstances of the filing and

the debtor's behavior pre- and post-petition, the court held that the record did not support the

bankruptcy court's previous finding of good faith and remanded for further findings on the issue.

*Id.* at 661-62.

The facts of *McGovern* bear little resemblance to the instant case.  In this case, DRUAP's

judgment against the Wades accounts for less than 50% of the Wade's potentially dischargeable

debt. On their Schedule E/F the Wades listed $55,000 in unsecured claims, $30,000 of which was

comprised of creditors other than DRUAP [Bnkry. Doc. 1]. Whether or not those creditors filed

claims is irrelevant in assessing the good faith of the Wades at the time of filing their petition.

Additionally, the Wades are a fixed income household, receiving all income from social security

and their pensions, with a combined monthly income of approximately $3,800. As such, the Wades

do not have any reasonable likelihood of significantly increasing their income or earning potential,

a marked difference from the *McGovern* case. The Wades are not retaining any luxury items, and

they have surrendered a parcel of real estate and cash in a bank account to creditors. Other than a

car payment that DRUAP erroneously asserts is disproportionately expensive to the Wades

income, there are no allegations here of a luxurious or extravagant lifestyle. Finally, DRUAP

makes a point of asserting in several filings that the Wades filed their petition the day before a

post-judgment deposition in order to "avoid…discovery and collection efforts." [Adv. Doc. 10],

[Bnkry. Doc. 54]. However, by submitting themselves to the jurisdiction of the bankruptcy court,

the Wade's finances have been and will continue to be thoroughly disclosed. Obtaining a breathing spell from collection efforts is permitted and even contemplated by the Bankruptcy Code and should not be read as per se bad faith. The totality of the circumstances clearly distinguishes the *McGovern* debtor from the Wades and warrants a finding that they filed and converted their case in good faith.

DRUAP also makes the argument that one of the most important factors to consider in the good faith analysis is whether the Wades ever attempted to pay the judgment pre-petition. The Court can only conclude from the evidence on the record that the Wades did not make any payments to DRUAP, just as they failed to make payments to another judgment creditor. In *Kitchens*, the court cites numerous cases where courts have "refuse[d] to adopt a per se rule that a debtor's failure to make substantial repayment demonstrates lack of good faith: Congress has nowhere in the statute provided a definition of the term "good faith." The legislative history is similarly silent on the point…[H]ad Congress intended that such repayment be a condition precedent to confirmation of all Chapter 13 plans it could have explicitly so stated." *Kitchens*, 702 F.2d at 888.

DRUAP also relies in briefing and in oral argument on the pre-BAPCPA cases *In re Whitlock* (confirming plan of debtor and granting discharge of judgment based on breach of fiduciary duty as father's executrix), *In re Caldwell* (dismissing case of Chapter 13 debtor who was seeking discharge of false arrest and imprisonment judgment and had failed to disclosed substantial assets), and *In re LeMaire* (denying discharge to debtor of judgment from civil suit resulting from debtor attempting to kill someone by shooting him five times) in support of its

20

contention that the Wades failure to pay DRUAP pre-petition is demonstrative of bad faith.[12] All
of these cases concerned good faith analysis of a debtor's Chapter 13 plan in relation to the
dischargeability of certain debts, and this Court does not dispute that while pre-petition behavior
of the debtors was a factor considered by the courts, it was certainly not the only factor. In fact,
only in *Caldwell* did the court emphasize the importance of the debtor's actions post-judgment to
avoid paying the creditor. *Caldwell*, 895 F.2d at 1127. Taking all relevant factors into
consideration – the totality of the circumstances - this Court finds that the filing and conversion of
the Wades' case was done in good faith.

### E.  Payment of Unsecured Creditors

DRUAP alleges that the Wades' monthly payment of $60.00 for surgery performed on Mrs.
Wade is improper and, thus, indicative of the Wades' bad faith. But the evidence showed that this
payment on Schedule J was for a post petition surgery so it is not improper.

DRUAP also asserts that North Main Credit Union received improper payments by
deducting payments from an account the Wades held there to repay a loan and that North Main
failed to file a proof of claim. "Section 553(a) does not contain a requirement that a creditor seeking
to exercise a setoff must first file a proof of claim."  *Matter of Cent. Equip. & Serv. Co., Inc.*, 61
B.R. 986, 988 (Bankr. N.D. Ga. 1986)(Kahn, J.)(*quoting In re Fulghum Const. Corp.*, 23 B.R. 147,
153 (Bankr. M.D. Tenn. 1982)).   Accordingly, § 553 only requires a secured creditor to have a
valid prepetition claim against the debtor to effectuate its valid right of setoff.  *In re MCB Fin.
Grp., Inc.*, No. 10-11176-WHD, 2011 WL 8609454, at *4 (Bankr. N.D. Ga. Mar. 31, 2011)(Drake,
J.).  Although the deduction of the post petition payments to repay the prepetition loan technically

---

[12] *In re Whitlock*, 308 B.R. 917 (Bankr. M.D. Ga. 2004); *In re Caldwell*, 895 F.2d 1123 (6th Cir. 1990); *In re LeMaire*, 883 F.2d 1373 (8th Cir.), *reh'g granted, judgment vacated sub nom. In re Lemaire*, 891 F.2d 650 (8th Cir. 1989), and *on reh'g*, 898 F.2d 1346 (8th Cir. 1990).

should have been stopped, the deduction was harmless because North Main had a right of set off and the Wades proposed in their plan to surrender the balance of the account to North Main to repay the loan anyway.  The Wades were not permitted to use the money in their credit union account without providing North Main adequate protection, which was clearly impossible in this case.  Accordingly, this Court finds no bad faith on the part of the Wades because North Main Credit Union was being paid the funds in this account in this case.

### F.  Inappropriate Expenses

DRUAP alleges that the Wades' scheduling of expenses associated with the care of their non-custodial great grandchild and the payment of bail for Winnifred Wade's son constitute fraudulent transfers under 11 U.S.C. § 548.  [Doc. 54 at ¶¶ 5,6]. As previously discussed in footnote 2, DRUAP has failed to follow proper procedure by making formal demand upon the trustee to bring such an action, so the Court will deny this part of the motion without prejudice and will not reach the merits of DRUAP's argument as it relates to fraudulent transfers. The Court will note, however, that the Wades scheduling of expenses related to the care of their non-custodial great grandchild, does not appear to be inappropriate.[13] Furthermore, the bail payment was de minimis in the grand scheme of things so the Court will not deny confirmation over that.  Finally, the Court

---

[13] During the hearing on December 17, 2018, Mr. Wade testified that his great grandson was not staying with the Wades as frequently anymore because he was now old enough to attend school, although another great grandchild was also being cared for and transported on occasion. There also appeared to be some confusion about the scheduling of medical expenses as out-of-pocket or covered by insurance.  The Court has considered whether this could potentially lower the Wades' expenses and thereby increase income available to contribute to the plan, but the Court has decided not to require the Wades to adjust their plan payment on account of this because (1) the Wades had lower expenses in some areas than allowed on the means test so the expenses basically even out, in other words the Court will not penalize a debtor who is subject to a 36 month applicable commitment period who is thrifty in some areas because the debtor wants to spend money in other necessary areas such as the care of family members and (2) the effect of increasing the monthly plan payment would only serve to shorten the time period over which the secured creditor – who has not objected to its treatment - would get paid and not produce any benefit to unsecured creditors.

overrules the objection to the Wades' tithing expenses because the evidence showed they tithed in the same amount prior to the filing the case.

For the above-stated reasons, this Court is unwilling to find that the Wades have acted in bad faith in seeking to discharge their debt to DRUAP under Chapter 13.  In summary, this Court finds the Wades have satisfied the totality of circumstances test after application of each *Kitchens* factor, and this Court is unwilling to ignore the intent of Congress in the broad discharge it granted to Chapter 13 debtors.   As a result, this Court overrules the objection that the Wades' case was filed or converted in bad faith and finds that the Wades' plan was, in fact, proposed in good faith and that the Amended Plan should be confirmed.

## CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that DRUAP's Amended Motion to Dismiss is **DENIED**, and

**ORDERED** that DRUAP's Amended Complaint is **DISMISSED**, and

**ORDERED** that the Amended Plan is **CONFIRMED**.  The Court shall issue its standard order confirming a Chapter 13 plan that provides for the avoidance of judicial liens under §522.

The Clerk is directed to serve a copy of this order on DRUAP, counsel for DRUAP, Debtor, counsel for Debtor, the Chapter 13 trustee and the United States Trustee.

**[END OF DOCUMENT]**